**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

| | | |
|---|---|---|
| RICHARD H. BARNES, JR., | ) | Case No. 9:21-cv-80722-RKA |
| | ) | |
| Plaintiff, | ) | Judge Roy K. Altman |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| LAMAR JACKSON, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## OPPOSITION TO MOTION TO DISMISS THIRD AMENDED COMPLAINT

Plaintiff, by and through the undersigned counsel, hereby opposes Defendants' Motion to Dismiss Third Amended Complaint (D.E. 91).

1

## MEMORANDUM OF LAW

### I. LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), Plaintiff need only provide a short and plain statement of the claim showing that he is entitled to relief. *See Simpson v. Sanderson Farms, Inc.* 744 F.3d 702, 708 (11th Cir. 2014). While Plaintiff's complaint need not contain detailed factual allegations, he "must demonstrate 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Simpson*, 744 F.3d at 708 (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 545 (2007)). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The standard is met where the facts alleged enable "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In evaluating a motion to dismiss under Rule 12(b)(6), a court does not make factual determinations. *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998). Rather, the court is confined to a review of the pleadings, must accept the well-pleaded facts as true, and must resolve any factual issues in a manner favorable to the non-moving party. *See Quinones v. Durkis*, 638 F.Supp. 856, 858 (S.D. Fla. 1986); *see also Katz v. Chevaldina*, 900 F.Supp.2d 1314, 1315 (S.D. Fla. 2012) ("The court generally is limited in its review to the 'four corners of the complaint'.") (quoting *Speaker v. U.S. Dep't of Health & Human Servs.*, 623 F.3d 1371, 1379 (11th Cir. 2010). A Rule 12(b)(6) motion can only be granted if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *See Hishon v. King & Spalding*, 467 U.S. 69, 72 (1984); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Federal Rule of Civil Procedure 12(d) states that if in a motion under Rule 12(b)(6), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56, and all parties must be given a reasonable opportunity to present all the material that is pertinent to the motion. If the court relies on extrinsic evidence, the motion is converted into a Rule 56 summary judgment motion, for which there is a significantly different standard. *See Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003); *Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, n. 11 (11th Cir. 1997).

With respect to Rule 12(b)(7), "courts are loath to grant motions to dismiss of this type." *Microsoft Corp. v. Cietdirect.com LLC*, 2008 WL 3162535, *5 (S.D. Fla. 2008) (quoting *Sever v. Glickman*, 298 F.Supp.2d 267, 275 (D.Conn. 2004)). District courts addressing a motion to dismiss

under Rule 12(b)(7) and Rule 19 undergo a two-step inquiry. First, the court determines whether the absent party is a "required party" within the meaning of Rule 19. *See Auto-Owners Ins. Co. v. Morris*, 191 F.Supp.3d 1302, 1303 (N.D. Ala 2016) (citing *Molinos Valle del Cibao v. Lama*, 633 F.3d 1330, 1344 (11th Cir. 2011)). If so, and the absent party can be joined, the court must order that it be made a party. *Id.* (citing Fed. R. Civ. P. 19(a)(2) (quotations omitted). Next, if the required absent party cannot be joined, the court must consider if, "in equity and good conscience, the action should proceed among the existing parties or should be dismissed." *Id.* To make this decision, the court considers the factors listed in Rule 19(b). *Id.* The court may look not only at the pleadings but also at evidence presented by the parties. *See Auto-Owners Insurance Co.*, 191 F.Supp.3d at 1303 (citing *Estes v. Shell Oil Co.*, 234 F.2d 847, 849 n.5 (5th Cir. 1956)). The moving party bears the initial burden of showing that the person who was not joined is necessary for a just adjudication, and can satisfy its burden by providing relevant extra-pleading evidence. *See Weeks v. Housing Auth. of City of Opp, Ala.*, 292 F.R.D. 689, 692 (M.D. Ala 2013). While extrinsic evidence may be considered, a Rule (12)(b)(7) motion requires the Court to accept the allegations of the complaint as true. *Microsoft Corp.*, 2008 WL 3162535 at *5.

## II. ARGUMENT

### 1. Defendants' 12(b)(7) Motion

Defendants' 12(b)(7) motion is meritless at least because Defendants have not met their burden of establishing that Imagn Content Services, LLC ("Imagn") is necessary for a just adjudication of Plaintiff's claims. Secondly, even if Imagn is somehow considered a necessary party, Imagn can easily be joined as a party. Accordingly, dismissal under Rule 12(b)(7) is improper.

To satisfy their burden, Defendants have offered only an unsupported definition of "necessary party," allegations of a vague "vested interest" of Imagn in the outcome of this litigation, an unsupported allegation that complete relief cannot be granted in Imagn's absence, and a legally unjustified fear of future actions by Imagn. None is sufficient to require Imagn as a necessary party.

Defendants summarily argue that, "[a]lmost by definition, given its commercial and property rights in the Barnes Photographs, and vested interest in the outcome of this matter, [Imagn] is a necessary party under Rule 19." (D.E. 91 at 9). Defendants cite *Borchers v. Amazon.com, Inc.*, 2019 WL 5196117 (S.D. Fla. 2019), presumably for their asserted "definition" of a necessary party under Rule 19. *Borchers* provides no such definition, and Plaintiff is unaware of any case that does.

Defendants also argue that Imagn is a necessary party "based upon its vested interest…." (D.E.

91 at 5). Defendants point to section 7 of the 2012 Active Photographer Agreement ("2012 APA")[1], asserting that it (a) provides Imagn with the full and complete authority to make claims or institute proceedings to prosecute unauthorized use of the Barnes Photographs, and (b) requires that all settlements be made in the sole and absolute discretion of Imagn. *Id.* For several reasons, section 7 of the 2012 APA does not establish Imagn as a required party within the meaning of Rule 19.

Initially, Defendants have selectively eliminated the word "customer" from their reading of section 7 of the 2012 APA, effectively misrepresenting its scope. The first sentence of section 7 explicitly states that it relates to "unauthorized use of any Images *by any customer.*" (D.E. 91-3 at 5, ¶7; emphasis added). Section 7 later refers to "such actions," making it clear that any actions under this paragraph relate to those brought against customers of Imagn. None of the Defendants are customers of Imagn, and Defendants do not argue otherwise. Accordingly, section 7 simply does not apply to the infringements alleged in this lawsuit and cannot operate to make Imagn a necessary party.

Even if section 7 is read to apply to infringements by non-customers of Imagn, such as those alleged in this lawsuit, any ability it provides Imagn to bring actions for unauthorized uses of the Barnes Photographs does not make Imagn a necessary party to this action at least because Plaintiff can bring infringement actions, on his own, as the legal owner of the copyrights to the Barnes Photographs. Assuming *arguendo* that the 2012 APA controls the relationship between Plaintiff and Imagn, section 1 of the agreement explicitly states that "Photographer shall retain the copyright to the Images." (D.E. 91-3 at 2, ¶1.) The Copyright Act allows a legal or beneficial owner of an exclusive right under a copyright to institute an action for infringement. (17 U.S.C. §501(b)). Plaintiff's ability to bring suit as the legal owner necessarily prevents Imagn from having the "full and complete authority" to do so. The 2012 APA recognizes this, requiring Imagn to make any claim for copyright infringement "in Photographer's name," *i.e.*, in the name of Plaintiff. (D.E. 91-3 at 5, ¶7.) The copyright registrations for the Barnes Photographs reflect Plaintiff's ownership status (D.E. 85-12 at 15-16; D.E. 85-13 at 2) and Defendants "concede that Plaintiff owns copyrights to the Barnes Photographs." (D.E. 91 at 11.)

The language in section 7 relating to Imagn having discretion over settlements is also insufficient to make Imagn a necessary party, even if section 7 is read to apply to non-customers of Imagn. Defendants have, again, omitted key language to present that portion of the 2012 APA out of

---

[1] Plaintiff does not admit that the 2012 APA is the controlling agreement between Plaintiff and Imagn with respect to the facts of this case. Mr. Odle testified at his deposition that he did not know whether the 2012 APA, or a later agreement, applies here. (D.E. 97 at 37-38.)

4

context and to mischaracterize its scope. Section 7 explains that, if Imagn "chooses not to pursue any legal action, Photographer reserves the right to do so after notification from" Imagn. In this case, Imagn granted Plaintiff written permission to proceed with this lawsuit after Imagn chose not to pursue the matter, prior to this lawsuit being filed. Plaintiff submits herewith as Exhibit 1 the entire 2021 email chain between Plaintiff's counsel and Bruce Odle, President of Imagn, only a small portion of which Defendants selectively included with the Motion to Dismiss ("MTD"). Most notably, on April 6, 2021, before the filing of this lawsuit, Mr. Odle wrote the following to Plaintiff's counsel:

> I've consulted with our legal counsel and we do not intend to pursue this case
> directly and, therefore, grant you written permission by way of this e-mail to
> pursue this matter against Lamar Jackson on behalf of Rich Barnes.

(Ex. 1 at 10.) To any extent that Imagn had an ability to bring or to be a required participant in this action, Mr. Odle's email effectively extinguished it. Furthermore, any right or interest Imagn derives from the language of section 7 is contractual in nature and unrelated to the enumerated exclusive rights statutorily vested in a copyright owner. Consequently, Imagn's remedy for violation of any such right or interest would be pursuit of a contract claim against Plaintiff, not a copyright claim against Defendants. Lastly, any discretion granted to Imagn under section 7 relates only to "settlements," which, by definition, are *inter partes* alternatives to adjudication by the Court. (D.E. 91-3 at 5.)

Defendants assert, without support or even further explanation, that Imagn is a necessary party because "complete relief cannot be accorded in its absence." (D.E. 91 at 9.) As detailed above, Plaintiff is the legal owner of the copyrights in the Barnes Photographs and Imagn has relinquished any right it had to bring an action against Defendants. The Court can accord Plaintiff complete relief for the alleged infringements without Imagn's involvement as a party.

Defendants also argue that they "could face another lawsuit by [Imagn] and thus a potential inconsistent obligation within the meaning of Rule 12(a)(2)(ii)" if Defendants were to prevail in this case. This feigned fear is pure fiction, though, because (1) as detailed above, Imagn has relinquished whatever right it had under the 2012 APA to sue Defendants; (2) Imagn is not a legal or beneficial owner of the enumerated right to prepare derivative works based upon the Barnes Photographs; and (3) Imagn is not a legal or beneficial owner of any enumerated right under Plaintiff's copyrights in the Barnes Photographs because the 2012 APA is not an exclusive license.

A copyright license or assignment may transfer less than all of the exclusive rights of a copyright owner. The Copyright Act, accordingly, grants the right to sue on the basis of individual

rights. 17 U.S.C. § 501(b); *See Roberts v. Gordy*, 359 F.Supp.3d 1231, 1240-1241 (S.D. Fla. 2019). The Third Amended Complaint ("TAC") alleges that Defendants created derivative works of the Barnes Photographs. (D.E. 85 at ¶¶ 38, 77, 99, 118, 120, 133, 141, 150, 157.) Plaintiff never granted to Imagn the right under 17 U.S.C. § 106(2) to prepare derivative works based on the Barnes Photographs. The 2012 APA reflects this, making no mention of derivative works in the "Grant of Authority." (D.E. 91-3 at 2, ¶1.) Therefore, Plaintiff remains the sole legal and beneficial owner of the enumerated exclusive right to create derivative works and Imagn has no ability to sue Defendants, or any party, for alleged violation of this right. *See Roberts*, 359 F.Supp.3d at 1240-1241.

To any extent that Plaintiff granted Imagn exclusive rights through the 2012 APA other than the right to create derivative works of the Barnes Photographs, or to the extent such other exclusive rights are at issue in this case, Plaintiff's right to receive royalties, established in section 6b of the 2012 APA, makes Plaintiff the beneficial owner of these other enumerated rights. *See Smith v. Casey*, 741 F.3d 1236, 1242 (11th Cir. 2014). Therefore, Plaintiff has the legal ability to bring this lawsuit alone under 17 U.S.C. § 501(b), and Imagn has no ability to bring its own lawsuit in light of Plaintiff's action. Furthermore, there is no basis for arguing that Imagn is somehow a beneficial owner of any enumerated right under Plaintiff's copyrights because the Eleventh Circuit has only ever found "beneficial ownership" where an author parts with legal title to the copyright in exchange for royalties. *See Roberts*, 359 F.Supp.3d at 1247 (citing *Smith v. Casey*, 741 F.3d 1236, 1242 (11th Cir. 2014)).

Furthermore, Imagn has no ability to bring an action as the legal owner or the beneficial owner of any exclusive right under the copyrights in the Barnes Photographs by virtue of the 2012 APA because the agreement is not an exclusive license despite use of the term "exclusive" in the grant of authority. The 2012 APA provides that the photographer "shall have a limited right to license the images" to certain parties under certain circumstances. (D.E. 91-3 at 2, ¶1.) By definition, a license agreement that permits the licensor to grant a license to other parties is not an exclusive license. Accordingly, the 2012 APA did not empower Imagn to sue for infringement beyond the express terms of the agreement. *See Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011) ("only the legal or beneficial owner of an 'exclusive right' has standing to bring a copyright infringement action").

Additionally, Defendants are incorrect in their argument that any verdict in this matter will not include or bind Imagn under the principles of res judicata or collateral estoppel. Collateral estoppel could apply to prevent a re-litigation of the questions of whether Defendants infringed Plaintiff's copyrights once said questions are decided in this lawsuit, regardless of the identity of the plaintiff in

a future suit. *See, e.g., Deweese v. Town of Palm Beach*, 688 F.2d 731, 733 (11th Cir. 1982) (enumerating the prerequisites of collateral estoppel, none of which include identity of a party).

Lastly, Defendants' argument regarding lack of personal jurisdiction over Imagn is nonsensical. This Court does, in fact, have personal jurisdiction over Imagn. The MTD acknowledges that Imagn is a Florida Limited Liability Corporation, and even includes as an exhibit Imagn's Florida Limited Liability Company Annual Report. (D.E. 91 at 10; D.E. 91-1.) For a corporation, the "paradigm" forums for the exercise of personal jurisdiction are its place of incorporation and principal place of business. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). Thus, general jurisdiction over Imagn exists in Florida. Furthermore, the Florida Long-Arm Statute provides that "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state" is an act subjecting a person to jurisdiction in courts of the state. Fla. Stat. § 48.193(1)(a)(1). As a Florida LLC with a Florida registered agent, Imagn operates in Florida and has agency in Florida. (D.E. 91-1.) Accordingly, if the Court determines that Imagn is a necessary party, Imagn can easily be joined as a party, making dismissal under Rule 19(b) inappropriate.

As part of the jurisdiction argument, Defendants assert that "Defendants are also citizens of Florida" (D.E. 91 at 10), as if this were relevant to whether the Court would have personal jurisdiction over Imagn.[2] Defendants appear to conflate personal jurisdiction with subject matter jurisdiction, and appear to imply that this case relies on diversity jurisdiction, which it does not.

Analyzing the factors enumerated in Rule 19(b) in view of the above, a judgment rendered in Imagn's absence would not prejudice Imagn or the existing parties because Imagn has no right to sue for the creation of derivative works of the Barnes Photographs, and Imagn has granted Plaintiff written permission to file this lawsuit, thereby granting back to Plaintiff whatever rights to sue that the 2012 APA conveyed to Imagn. For the same reasons, a judgment rendered in Imagn's absence would be adequate. Furthermore, Plaintiff would not have an adequate remedy if the action were dismissed for nonjoinder of Imagn. Through the 2012 APA, Plaintiff negotiated an arrangement in which Plaintiff retained the right to enforce his copyrights at the very least when Imagn granted him permission to do so, as was done in this case. Plaintiff would be left with no remedy for the infringements of his copyrights by Defendants and would lose the benefit of his bargain in the 2012 APA if this action were dismissed for the nonjoinder of Imagn.

---

[2] It is also noted that at least one defendant, Lamar Jackson, is alleged in the TAC to be a resident of Maryland, not Florida. See D.E. 85 at ¶6.

In sum, Defendants fail to establish that Imagn is a necessary party. Even if the Court does determine that Imagn is a necessary party, Imagn could easily be joined as a party. Therefore, dismissal under Rule 12(b)(7) is inappropriate, and Defendants' motion should be denied.

**2. Defendants' 12(b)(6) Motion**

Defendants use their 12(b)(6) motion to assert various substantive defenses, disregarding the standard under Rule 12(b)(6) by arguing about facts not alleged in the TAC. The Court must limit its analysis of the 12(b)(6) motion to only the facts alleged in the TAC and reject these arguments, or treat the MTD as a motion for summary judgment and apply the appropriate standard.[3]  All of the following alleged facts argued in the MTD are beyond the scope of the TAC, have no support in the TAC, and, in some cases, are contrary to facts alleged in the TAC: (1) that the claimed offending items "were developed from the noncopyrighted Louisville Instagram Posts and the ACC Video,"[4] and the existence of these things (D.E. 91 at 11); (2) that a Google search of "Lamar Jackson leap" confirms the origin of the claimed infringing items (D.E. 91 at 11); (3) that the Stacks promotional video plainly demonstrates Defendant Dupont's reliance upon certain "non-copyrighted items" (D.E. 91 at 11); (4) that Jackson and Dupont "believed that noone [sic] was claiming a protectable copyright interest in the leap photograph . . . and that they had an implied license, just as the Louisville and ACC did, to use the photograph" (D.E. 91 at 11-12); (5) the existence of a license or an implied license by the University of Louisville or the ACC (D.E. 91 at 12); (6) that the 2016 social media posts by Jackson of some of the Barnes Photographs were made at a time he was still a student-athlete and "prohibited from receiving any income during that time" (D.E. 91 at 15); (7) that Defendants "made little money from" use of the Leap Logo (D.E. 91 at 19); (8) that Defendants "no longer use" the Leap Logo and "have not used it since receiving" the first cease and desist letter (D.E. 91 at 19); and (9) that because the Barnes Photographs "would be linked to the NFL Superstar" through Defendants' use of the Barnes Photographs, their exposure and value would increase (D.E. 91 at 18). All of these factual allegations in the MTD must be disregarded by the Court in ruling on the 12(b)(6) motion unless the 12(b)(6) motion is treated as a summary judgment motion and the appropriate standard is applied.

---

[3] If the Court treats the MTD as a motion for summary judgment, it must be denied because material facts are in dispute and Defendants are wrong on the law. For example, Defendants contend that copying of the Barnes Photographs did not take place. (D.E. 91 at 11.) This is a material fact, because copying is an element of a copyright infringement claim, and it is contrary to the allegation of the TAC.

[4] The Louisville Instagram Posts and the ACC Video, in fact, include copies of the Second Hurdle Photograph. Therefore, this argument by Defendants is actually an admission that the claimed offending items "were developed from" the Second Hurdle Photograph.

Furthermore, the MTD consistently refers to "the Leapmode Logo and the Chain" (i.e., the Leap Logo and the Stacks Jewelry, respectively), and does not make any arguments concerning the Forever Logo or the Forever Silhouette Logo, both of which the TAC alleges constitute infringing derivative works of the Second Hurdle Photograph. The Court should keep in mind that Defendants have raised no arguments concerning the TAC's allegations with respect to these two derivative works.

### A. Copyright Claims

Defendants dispute that the Barnes Photographs were copied and that the claimed offending items are substantially similar to the Barnes Photographs. However, the question of substantial similarity in a copyright infringement case is a question of fact for a jury, not a question to be resolved through a 12(b)(6) motion. *See Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1213 (11th Cir. 2000) ("Copyright infringement is generally a question of fact for the jury to decide"); *see also Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1232 (11th Cir. 2010) ("substantial similarity is an extremely close question of fact"). The TAC sufficiently alleges substantial similarity, for example, by showing the Barnes Photographs, the Leap Logo, the Forever Logo, the Forever Silhouette Logo, Jackson's social media posts, and the Stacks Jewelry in TAC Exhibits 14-20, 22, 37, 45, and 46, respectively.

The term "substantial similarity" has been used to describe both the degree of similarity relevant to proof of copying and the degree of similarity necessary to establish unlawful appropriation. *See Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018). The pertinent element of a copyright infringement claim is copying protectable aspects of the work, not the new work being substantially similar to the copyrighted work. *See, e.g., Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1248 (11th Cir. 1999). Copyright law recognizes that direct evidence of copying is rare and allows a plaintiff to prove the required copying indirectly by establishing that the defendant had access to the copyrighted work and produced something "substantially similar" to it. *See Leigh*, 212 F.3d at 1214. The similarities between the two works need not be extensive, and they need not involve protected elements of the work; they need only be similarities one would not expect to arise if the two works had been created independently. *See Rentmeester*, 883 F.3d at 1117 (citing *Laureyssens v. Idea Grp., Inc.*, 964 F.2d 131, 140 (2nd Cir. 1992)). "Substantial similarity" is important in a second way, too – no matter how copying is proved, a plaintiff must establish that the allegedly infringing work is substantially similar to the plaintiff's work with regard to its protected elements. *Id.*

With respect to copying, Plaintiff has alleged copying of the Barnes Photographs in the TAC. (D.E. 85 at ¶¶ 126, 137, 182, 184-186, 188-190.) For the Stacks Jewelry in particular, the TAC provides

evidence of direct copying of the Second Hurdle Photograph in Exhibit 38, which is a photograph showing a cutout of Plaintiff's Second Hurdle Photograph on a workbench while the Stacks Jewelry was being created. Even if this evidence of direct copying were disregarded, the TAC sufficiently alleges that each of the Defendants had access to each of the Barnes Photographs at issue and made, or had made, unauthorized derivative works. For example, as detailed in the TAC, Plaintiff made all of the Barnes Photographs available for licensing through a news outlet, and posted each of the Barnes Photographs to a news outlet searchable archive. (D.E. 85 at ¶¶98, 110-115.) Thus, Plaintiff has sufficiently alleged that each of the Defendants had access to each of the Barnes Photographs, and the TAC sufficiently alleges copying of the Barnes Photographs by Defendants.

With respect to the infringing items being substantially similar to the protected elements of the Barnes Photographs, this is a finding of fact not appropriate for dismissal at the pleading stage. *See Leigh*, 212 F.3d at 1216. However, even if the Court were to analyze this, a simple, visual comparison of the Barnes Photographs (D.E. 85-8) to each of the Leap Logo (D.E. 85-22), the Forever Logo (D.E. 85-45), the Forever Silhouette Logo (D.E. 85-46), and the Stacks Jewelry (D.E. 85-37), as Defendants seemingly argue the Court should perform,[5] reveals that each of the infringing logos and the Stacks Jewelry is substantially similar to the Second Hurdle Photograph with regard to its protected elements.

The protected elements of a copyrighted work are those which have originality. *See Leigh*, 212 F.3d at 1214 ("copyright law protects only original expression"). Originality, which is a statutory and constitution requirement for copyrightability, "is not particularly stringent," requiring only that the author make the selection or arrangement independently (i.e., without copying that selection or arrangement from another work) and that the work display some minimal level of creativity. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 347, 358 (1991). "Federal courts have historically applied a generous standard of originality in evaluating photographic works for copyright protection." *Latimer*, 601 F.3d at 1235 (quoting *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 519 (7th Cir. 2009)). Most photographs contain at least some originality in their rendition of the subject matter, and these elements of originality in a photograph, which are protectable elements, "may include posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved," including shading, timing, depth of field, and selection of foreground and background elements. *See id.* (quoting *Rogers v. Koons*, 960 F.2d 301, 307 (2nd Cir.

---

[5] Defendants seemingly argue this at least with respect to the Leap Logo and the Stacks Jewelry, since the MTD is silent on the Forever Logo and the Forever Silhouette Logo.

1992)); s*ee also Leigh*, 212 F.3d at 1215; *see also Rentmeester*, 883 F.3d at 1122.

Defendants "do not dispute that Plaintiff's work is creative." (D.E. 91 at 17.) Plaintiff made multiple artistic and technical decisions in the creation of the Barnes Photographs, including selecting a position and angle from which to photograph the plays, selecting a camera body, lens, and focal length, as well as aperture and shutter speed settings to provide a creative depth of field and overall artistic impression. These decisions enabled Plaintiff to, for example, capture an image of the "famous Jackson leap" from a unique angle that caused, as one non-limiting example, Jackson's fingers on his right hand to be observable in a certain position extending downward from his body. (D.E. 85-8.) Notably, the copies embodied in each of the Leap Logo, the Forever Logo, the Forever Silhouette Logo, and the Stacks Jewelry include these extending fingers (see D.E. 85-22, D.E. 85-45, D.E. 85-46, D.E. 85-37), reflecting that these derivative works were copied from Plaintiff's Second Hurdle Photograph and not from some abstract concept of Jackson's leap. This feature is only observable in the Second Hurdle Photograph because of the creative decisions Plaintiff made when creating his photograph, including the specific position, angle, and point of focus. As the ordinary observer could see from the Second Hurdle Photograph (D.E. 85-8), if the camera had been a little lower or the depth of field had been a little shallower, the extending fingers on Jackson's right hand would not be visible extending below his body. Thus, this is a creative choice made by Plaintiff in creating the Second Hurdle Photograph and is a protected element in it. Defendants clearly appreciated the originality provided by Plaintiff's creative choices when they created these unauthorized copies of Plaintiff's Second Hurdle Photograph because this feature is included in them.[6]

Furthermore, the spikes on Jackson's left cleat extending away from Jackson's left foot are only observable in the Second Hurdle Photograph because of the specific position and angle at which Plaintiff created the Second Hurdle Photograph. However, the Leap Logo, the Forever Logo, and the Forever Silhouette Logo copied these spikes as well. (D.E. 85-22, 85-45, 85-46.) As another example, the position and angle from which the Second Hurdle Photograph was created also make observable certain padding sticking out on the right side of Jackson's back just under where Jackson's right sleeve ends. (D.E. 85-8.) As the ordinary observer would recognize, if Plaintiff had taken the Second Hurdle Photograph from just a little to the right of where he was positioned, this padding would not be visible

---

[6] Plaintiff notes that the Exhibit E of the MTD includes a blurred and non-marbled version of the Leap Logo, not the actual Leap Logo that was the subject of the Leap Trademark Application and applied to merchandise. The Court should refer to D.E. 85-22 instead of D.E. 91-5 to see the Leap Logo.

in the Second Hurdle Photograph. Sure enough, the Leap Logo, the Forever Logo, the Forever Silhouette Logo, and the Stacks Jewelry each include this feature as well. (D.E. 85-22, 85-45, 85-46, 85-37.) With respect to the Stacks Jewelry, it is apparent that this unusual padding was added to the back side of the figure, given its three-dimensional nature, as best seen on page 4 of Exhibit 37 to the TAC, where one can see a bulge in the back right where the padding is seen in the Second Hurdle Photograph. These are merely some non-limiting examples of the protected elements of the Second Hurdle Photograph which were copied in making the infringing logos and the Stacks Jewelry. Defendants' significant efforts to include minute details from the Barnes Photographs belie Defendants' argument that the photographs lack originality.

Moreover, courts have affirmed that spontaneous photography of newsworthy persons or events is sufficiently original to warrant copyright protection. *See, e.g., Harney v. Sony Pictures Television, Inc.*, 704 F.3d 173, 185 (2nd Cir. 2013) ("assuring copyright protection for fleeting images of newsworthy persons or events encourages freelance photographers to continue creating new images, advancing the goal of the Constitution's copyright clause"). Thus, to the extent Defendants' argument about originality is distinct from Defendants' argument concerning substantial similarity to protected elements, it is meritless. The infringing items include, and are substantially similar to, numerous protected elements from the Barnes Photographs.

Defendants argue that the generalization of an athlete leaping over a defender is not original or creative, is a *scènes à faire*, and a common expression and idea not entitled to copyright protection. *Scènes à faire* are stock or standard features that naturally flow from a common theme, and are among unprotectable elements of a copyrighted work. *See Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994) (citing *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2nd Cir. 1986)). However, as discussed above, there are numerous protectable elements, not merely stock or standard features commonly associated with a leaping athlete, which were copied from Plaintiff's works by Defendants to create the infringing logos and the Stacks Jewelry. Each of the infringing logos and the Stacks Jewelry includes elements that are only observable in the Second Hurdle Photograph because of the angle, position, point of focus, and depth of field at which the Second Hurdle Photograph was taken. The Leap Logo, Forever Silhouette Logo, and Forever Logo each just so happens to portray the leaping player from the same exact angle at which the Second Hurdle Photograph was taken. This is not a coincidence. Defendants have not merely created logos or jewelry of a generic leaping football player. Rather, Defendants have made logos and jewelry of a leaping football player that include minute details

taken directly from the Second Hurdle Photograph, forcing the conclusion that substantial protected elements of the Second Hurdle Photograph were copied to create them. Notwithstanding this, Defendants' argument requires a factual determination that is not appropriate at the present stage.

The MTD cites *Rentmeester v. Nike, Inc.*, 883 F.3d 1111 (9th Cir. 2018) to argue that general poses are not copyright protected, and that Plaintiff cannot claim copyright protection to aspects of the photographs which necessarily flow from the idea of an athlete leaping over a defender. However, critically, in *Rentmeester*, the pose at issue was recreated by a second photographer, and it was this recreation which was later used to create the allegedly infringing silhouette Jumpman logo. In other words, the Jumpman logo in *Nike* was not copied from the plaintiff's copyrighted photograph. Instead, Nike commissioned its own photograph of Jordan and then used *that* photograph to create the Jumpman logo at issue. See *id.* at 1115-1116 (noting Nike hired its own photographer to produce its own photograph and subsequently create the "Jumpman" logo as a black silhouette that tracks the outline of the Nike photograph). Thus, in *Rentmeester*, there was no actual copying of the copyrighted photograph. This is critical because independent creation is a complete defense to copyright infringement. *See Rentmeester*, 883 F.3d at 1117 (citing *Feist*, 499 U.S. at 345-346). In contrast, here, the TAC alleges (and, in the case of the Stacks Jewelry, shows in Exhibit 38) direct copying of Plaintiff's photographs. The facts of *Nike* are therefore entirely distinguishable.

Furthermore, in *Rentmeester*, the court found that the various creative choices made by the photographer, such as Jordan's pose, the lighting, camera angle, depth of field, and selection of foreground and background elements, were not copied by Nike's commissioned photograph or the Jumpman logo. *See id.* at 1122 (noting Nike's photographer did not copy the pose, the setting, the angle, the positioning of Jordan in the photograph, or the lighting). With respect to the Jumpman logo, the court concluded that because the commissioned photograph was not substantially similar, and the Jumpman logo was "merely a solid black silhouette of Jordan's figure as it appears in the" commissioned photograph, the Jumpman logo could not be substantially similar to the plaintiff's photograph. *See id.* at 1123. That is distinct from the present case, in which the infringing logos and the Stacks Jewelry are representations of Jackson from the Second Hurdle Photograph specifically.

*Rentmeester* also involved a finding about substantial similarity, which, as noted above, is not appropriate in ruling on a 12(b)(6) motion because it is a question of fact for a jury. The dissent in *Rentmeester* called out the impropriety of making such factual determinations at the pleading stage, saying "such questions of substantial similarity are inherently factual, and should not have been made

at this stage of the game." *See id.* at 1125 (Owens, C.J., concurring in part and dissenting in part). The dissent in *Rentmeester* even cites an Eleventh Circuit decision, namely, *Leigh*, 212 F.3d at 1213, for this proposition. In *Leigh*, the Eleventh Circuit said that "[c]opyright infringement is generally a question of fact for the jury to decide," and found that the district court "erred in holding as a matter of law that no reasonable jury could find that" allegedly infringing images "were substantially similar to the aspects of [the photographer's] work protected by copyright." *See Leigh*, 212 F.3d at 1213.

The MTD argues there is no substantial similarity between the claimed offending items and the Barnes Photographs because the claimed offending items are different dimensional expressions of an athlete leaping under different settings, coloring, and circumstances. However, protected elements were copied, as described above. The change in dimensional expression does not preclude a finding that the claimed offending items have substantial similarity to protected elements of the Barnes Photographs.

The MTD argues briefly about an implied license. However, the existence of an implied license is a question of fact for a jury, as is the scope of an implied license. *See TracFone Wireless, Inc. v. Clear Choice Connections, Inc.*, 102 F.Supp.3d 1321, 1325 (S.D. Fla. 2015).

The MTD cites *MidlevelU, Inc. v. ACI Info. Grp.,* 989 F.3d 1205, 1217 (11th Cir. 2021) and *Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) to argue that courts have recognized an implied license and permission to use copyrighted material in web-based contexts. However, these cases turned on facts specific to web-based, and more specifically, search engine-based issues. The TAC does not allege that Defendants have been operating a search engine, making the search engine-related cases cited by Defendants irrelevant.

The MTD argues that Defendants' uses of the Barnes Photographs were transformative and fair use. Fair use is an affirmative defense that puts a burden on its proponent in demonstrating that it applies, and that presents a mixed question of law and fact. *See Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1259 (11th Cir. 2014) (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994)). Fair use requires weighing at least four statutory factors, which usually requires making factual findings or relying on undisputed or admitted material facts. *See Katz v. Chevaldina*, 900 F.Supp.2d 1314, 1315 (S.D. Fla. 2012). As such, determining the merits of the fair use defense is a fact-dependent exercise, making the issue inappropriate for disposition at the MTD stage. *See Id.* at 1315-1316 (fair use defenses "are not ripe for determination before the summary judgment stage").

Defendants argue that while fair use presents a mixed question of law and fact, "it may be

resolved as a matter of law when, such as here, the material facts are not in dispute." (D.E. 91 at 14.) However, it is impossible to know exactly which facts alleged in the TAC are not in dispute when Defendants have not yet had to answer the TAC, and thereby admit or deny the allegations contained therein. As one example, the factors enumerated in 17 U.S.C. § 107 include the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes. In the MTD, Defendants argue that the "social media posts by Jackson of some of the Barnes Photographs[7] were made at the time he was still a student-athlete at Louisville. They were not used for commercial gain, as a matter of law, as Jackson was prohibited from receiving any income during that time." (D.E. 91 at 15.) However, as alleged in the TAC, Plaintiff contends that each instance of Jackson's infringement of the Barnes Photographs constituted willful infringement of a copyright for purposes of commercial advantage or private financial gain. (D.E. 85 at ¶356.) Thus, the TAC makes an allegation regarding the commercial nature of "[e]ach instance" of Defendant Lamar Jackson's infringement which Defendants contradict in the MTD. Given that the commercial nature of the infringing use is a factor to analyze for considering a fair use defense, this is a material fact that is in dispute from the face of the TAC and the MTD. Clearly, the Court cannot make a fair use determination at this stage given the dispute of facts material to the factors for establishing fair use.

Though Plaintiff has no obligation to argue against any of the fair use factors at this stage, it is noted that Defendants' fair use position is extraordinarily weak. Plaintiff will briefly address each of the factors under 17 U.S.C. §107, all of which weigh against Defendants' fair use defense.

Under the first factor, all of Defendants' uses of Plaintiff's works are for commercial purposes, namely, either promoting the career of Mr. Jackson, creating a brand identity for Mr. Jackson's commercial exploitation, or creating a piece of jewelry embodying that brand logo for commercial sale. Also under the first factor, Defendants' wholesale appropriation of Plaintiff's works on social media do not transform the original works in any respect beyond unlawfully removing copyright ownership information. The conversion of Plaintiff's photograph into the form of logos and jewelry is also not transformative in that the message conveyed by the Defendants' copies is identical to the message conveyed in the original. See, e.g., *The Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, No. 19-2420 (2nd Cir. 2021) (creation of a series of paintings from a photograph not "transformative" and did not constitute fair use); *Rogers v. Koons*, 960 F.2d301, 309-11 (2nd Cir.

_____

[7] This constitutes an admission by Defendants that the 2016 social media posts were "of" the Barnes Photographs.  Defendants should be estopped from asserting otherwise in this litigation.

1992) (rejecting fair use defense as applied to a three-dimensional sculpture recreating a photograph).

Under the second factor, photography is a highly creative medium entitled to protection. *See, e.g., Belair v. MGA Entm't, Inc.*, 831 F.Supp.2d 687, 693 (S.D.N.Y. 2011) (noting a photograph may be original in the rendition of a subject, and originality may reside in the photographer's selection of lighting, shade, lens, angle, depth of field, composition, and other choices, such as manipulation of color balance, saturation, or contrast, that have an aesthetic effect on the final work). Defendants acknowledge that this factor weighs against a finding of fair use. (D.E. 91 at 17.)

Under the third factor, which is the amount and substantiality of what was taken in relation to the copyrighted work as a whole, Defendants used practically all (in the case of the social media posts) or the crux (in the logos and jewelry) of Plaintiff's creative contributions. This factor asks whether the copying used more of the copyrighted work than necessary and whether the copying was excessive, thereby examining whether the Defendants have "helped themselves overmuch" to the copyright work in light of the purpose and character of the use. *See Peter Letterese and Assocs., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1314 (11ᵗʰ Cir. 2008) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 587 (1994)). This factor, contrary to Defendants' arguments, cuts against a finding of fair use. As described above, each of the infringing logos and the Stacks Jewelry includes features (e.g., downwardly extending fingers, extending spikes from the left cleat, and extending padding from the back) that are observable in the Second Hurdle Photograph only because of the creative choices made by Plaintiff in creating the Second Hurdle Photograph, such as his position and the particular angle from which the Second Hurdle Photograph was captured, and these elements are not necessary to convey an image of a leaping football player. And with respect to Defendant Jackson's social media posts, Defendants make no argument about the extent of copying, nor can Defendants, because the social media posts in question reproduced the photographs in their entireties. (D.E. 85-19, 85-20, and 85-21.) Therefore, this factor also weighs against a finding of fair use.

Defendants argue the Leap Logo "did not simply replicate the Barnes Photographs," because the Leap Logo is a black silhouette, not a color photograph, does not have a Syracuse defender in it who is being hurdled by Jackson, does not have a Louisville wide receiver in it, does not depict a face mask on the helmet, does not include fans in the stands, and changes the appearance, mood, lighting, setting, expression, color, numbers, and style, as they appear in the photograph. (D.E. 91 at 15.) However, the Leap Logo includes numerous protected elements of the Second Hurdle Photograph, as noted above, and in any event this requires a factual determination that is inappropriate at this stage.

Defendants argue the Stacks Jewelry is three-dimensional, contains the number 8 on the front and back of the jersey, and contains many facial and helmet details not seen in the Barnes Photographs. However, these details do not transform the purpose of the original work. Moreover, the Stacks Jewelry does include numerous protected elements of the Second Hurdle Photograph, as discussed above, and in any event this requires a factual determination that is inappropriate at this stage.

Finally, under the fourth factor, Plaintiff's livelihood is supported by the licensing and sale of his creative output as a photographer. The notion that a celebrity athlete is privileged to exploit a photographer's work without a license because such use will lead to increased exposure for Plaintiff's work is as cynical as it is without legal basis. See e.g., *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F.Supp.3d 339, 355 (S.D.N.Y. 2017) ("[I]f CMG's practice of using celebrity and human interest photographs without licensing were to become widespread, it is intuitive that the market for such images would diminish correspondingly."). Defendants' uses rob Plaintiff of precisely the kind of licensing revenue upon which a professional sports photographer relies for his or her livelihood. Accordingly, a finding of fair use would be inappropriate here.

### B. RICO Claims

Defendants' arguments with respect to Plaintiff's RICO claims are meritless.

Defendants cite *Colonial Penn Ins. Co. v. Value Rent-A-Car Inc.*, 814 F.Supp. 1084 (S.D. Fla. 1992), to argue that the injured party must know or have reason to know that his injury is part of a pattern before he can be expected to file a civil RICO cause of action. However, the injured party knowing or having reason to know that his injury is part of a pattern was at issue in *Colonial Penn* because it is when the statute of limitations begins to run, not because it is an element of a RICO claim. *See id.* at 1091. Defendants have not raised a statute of limitations argument in the MTD.

Defendants argue that the TAC fails to allege with factual particularity Defendants' knowledge of any racketeering activity which is indictable as a criminal infringement of a copyright, implying that such an allegation is an essential element of a RICO claim. (D.E. 76 at 19.) However, this is not an element of a RICO claim, and *Colonial Penn* does not establish otherwise. In *Colonial Penn*, the RICO claims at issue involved predicate acts of mail fraud and wire fraud. *See* 814 F.Supp. at 1091. Fraud claims have a heightened pleading standard, including in the context of scienter, under Federal Civil Rule 9(b). *See id.* (citing *Connecticut Nat. Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2nd Cir. 1987) (noting plaintiff must provide some factual basis for conclusory allegations of intent). In contrast, here, Plaintiff's RICO claims are based on predicate acts of criminal copyright infringement, not fraud.

Therefore, the heightened pleading standard from Federal Civil Rule 9(b) relating to fraud or mistake does not apply in this case.[8]

Defendants argue that "because they made little money from" use of the Leap Logo, and because the Jackson Defendants "no longer use" the Leap Logo and "have not used it since receiving the" first cease and desist letter, Plaintiff's RICO claims are fatally flawed. (D.E. 91 at 19.) However, as noted above, these allegations in the MTD are beyond the scope of, and contrary to, the facts alleged in the TAC. (See D.E. 85 at ¶179, relating to the statement of use, in comparison to the time of receiving the first cease desist letter alleged in ¶171.)

To the extent Defendants argue that Plaintiff has not alleged a pattern of racketeering activity that is more than a single predicate act, Defendants are wrong. The TAC alleges a plethora of distinct example acts of copyright infringement, in paragraphs 118, 120, 124, 126, 133, 138-141, 149-152, 157-158, 165, 170, and 180-181, which paragraphs 344 and 387 incorporate into the RICO claims. These numerous distinct acts of copyright infringement involve the use of several different forms of media, namely, social media posts, logos applied to apparel and other goods, a sculptural work, and photographs. Notably, the Eleventh Circuit has rejected the argument that acts which are part of the same scheme or transaction cannot qualify as distinct predicate acts. *See U.S. v. Watchmaker*, 761 F.2d 1459, 1475 (11th Cir. 1985). Rather, the standard is whether each act constitutes "a separate violation of the [state or federal] statute" governing the conduct in question. *Id.* The TAC alleges, in paragraph 356, that each of the instances of copyright infringement constituted criminal copyright infringement under 17 U.S.C. § 506(a)(1)(a), indictable under 18 U.S.C. § 2319, and the factual allegations in the TAC surrounding these events establish the elements of criminal copyright infringement.

The first prong in establishing a pattern of racketeering activity is the notion of related acts, where related acts under RICO means criminal conduct which must have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise be interrelated by distinguishing characteristics which are not isolated events. *See Colonial Penn Ins. Co.*, 814 F.Supp. at 1093 (citing 18 U.S.C. § 3575(e)). Here, as alleged in paragraph 357 of the TAC, each of the instances of criminal copyright infringement was related by involving the same victim, namely, Plaintiff. Further, as alleged in paragraph 358 of the TAC, the instances of criminal copyright infringement were conducted through a pattern in that multiple of them involved the same or similar methods of commission, namely,

---

[8] Even if a heightened pleading standard did apply, the TAC would easily satisfy it given the specificity and detail of the allegations contained therein and the Exhibits accompanying it.

Defendant Jackson posting infringing content on social media accounts. Thus, the TAC alleges a pattern of related acts.

As stated in paragraphs 345-346 of the TAC, a criminal infringement of a copyright, which is an act of racketeering activity under 18 U.S.C. § 1961(1), requires a willful infringement of a copyright committed for purposes of commercial advantage or private financial gain. 17 U.S.C. § 506(a)(1)(A). Willfulness "encompasses reckless disregard of the possibility that one's actions are infringing a copyright." *See Yellow Pages Photos, Inc. v. Zipolocal, LP*, 795 F.3d 1255, 1272 (11th Cir. 2015).

Here, the TAC contains specific allegations establishing willfulness that are quite rare in copyright infringement cases. Defendant Jackson is on record on the Dan Patrick Show (prior to creating and using his brand logo misappropriating the Second Hurdle Photograph) discussing the debt he owes Plaintiff for taking the Second Hurdle Photograph, saying he "owes it to the great photographer." (D.E. 85 at ¶¶122-123.) This shows that Defendant Jackson was aware and appreciative of, and recognized the enormous value in, Plaintiff's Second Hurdle Photograph, before the Leap Logo was created and used to sell merchandise, and before the Forever Logo and the Forever Silhouette Logo were created and used to promote Defendant Jackson's charity. Furthermore, Defendant Dupont or Defendant Stacks, or an agent thereof, is documented on video creating jewelry based on the Second Hurdle Photograph with a cutout of the Second Hurdle Photograph on the workbench, which the TAC alleges was directed by Defendant Jackson. (D.E. 85-38; D.E. 85 at ¶157-158.) Rarely is such evidence of blatant willfulness available at the pleading stage. Clearly, the TAC includes sufficient allegations of facts to support willfulness.

With respect to a purpose of commercial advantage or private financial gain, the TAC alleges that Jackson, Jones, and/or Enterprises offered for sale apparel that displayed the Leap Logo, which was copied using Plaintiff's Second Hurdle Photograph. (D.E. 85 at ¶¶126, 187.) Selling merchandise with an infringing logo on it is undeniably for the purpose of private financial gain, and Defendants now "concede that the" Leap Logo and the Stacks Jewelry "were used for commercial purposes." (D.E. 91 at 15.) The TAC alleges that the promotion of apparel sold through Enterprises provided Jackson, the president and an owner of Enterprises, with commercial advantage and financial gain. (D.E. 85 at ¶¶352, 26.) Accordingly, the TAC sufficiently alleges that the instances of copyright infringement were willful and were for the purposes of commercial advantage or private financial gain.

Defendants argue that Plaintiff has failed to state with particularity the nature of the predicate RICO acts committed by Defendants and how those predicate acts amount to or pose a threat of

continued criminal activity. (D.E. 91 at 19.) While the nature of the predicate RICO acts is addressed above, the second prong in satisfying a pattern of racketeering activity is the continuity requirement. *See Colonial Penn Ins. Co.*, 814 F.Supp. at 1094. Continuity "may be demonstrated in a variety of ways" and is centrally a temporal concept that "may be either closed- or open-ended." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 230 (1989). Continuity may be demonstrated over a closed period by providing a series of related predicates extending over a substantial period of time, or otherwise it must be shown that the predicates establish a *threat* of long-term racketeering activity, for example because the predicates are part of the regular way of doing business for an ongoing entity or a regular means of conducting or participating in an ongoing RICO enterprise. *Id.* at 230. Thus, a § 1962(c) claim can be alleged as either an open-ended scheme, where there is a threat of continued racketeering activity, or as a closed-ended scheme, where it is not necessary to have a threat of continued racketeering activity. Here, Plaintiff has pled each alternative in the TAC with factual particularity.

The TAC alleges that Defendant Jackson's pattern of racketeering activity is an ongoing scheme in that Defendant Jackson continues to attend events for Defendant Forever Dreamers Inc. at which infringing merchandise is provided to attendees. (D.E. 85 at ¶361.) The TAC alleges that Defendant Forever Dreamers Inc. provides infringing merchandise, obtained from Defendant Lamar Jackson Enterprises Incorporated, to attendees of events sponsored by Defendant Forever Dreamers Inc. at which Defendant Jackson appears, and which are promoted on the website of Defendant Forever Dreamers Inc. (D.E. 85 at ¶151-152, 362.) The TAC alleges that as recently as October 25, 2021, the website of Defendant Forever Dreamers Inc. promoted the Forever Silhouette Logo. (D.E. 85 at ¶ 154.) Furthermore, the TAC alleges that because Defendant Jackson owns a trademark registration for the infringing Leap Logo there is a real threat of repeated racketeering activity by Jackson that exists. (D.E. 85 at ¶360.) The TAC alleges that Jackson filed United States Trademark Registration Application Serial Number 87/796,367 for a mark that was copied using Plaintiff's Second Hurdle Photograph. (D.E. 85 at ¶126; see also D.E. 85-22, 85-23.) As further alleged in paragraph 360 of the TAC, the Leap Trademark registration acts as *prima facie* evidence of Jackson's ownership of a mark the use of which constitutes infringement of Plaintiff's copyright in the Second Hurdle Photograph. *See Iancu v. Brunetti*, 139 S.Ct. 2294, 2297 (2019) (noting that 15 U.S.C § 1115 provides the owner of a trademark registration with benefits such as *prima facie* evidence of the mark's validity and constructive notice of ownership). Owning this trademark registration poses a real threat of the mark in the trademark

registration (i.e., the Leap Logo) being used in commerce because, indeed, a trademark registration cannot be procured or maintained without continued use of the mark in commerce. *See id.* (citing 15 U.S.C. § 1051(a) to note that a trademark is eligible for registration if it is used in commerce). Thus, the TAC sufficiently alleges open-ended continuity.

Furthermore, open-ended continuity can be sufficiently pled by alleging that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. *See H.J. Inc.*, 492 U.S. at 230; *Dadalus Capital LLC*, 625 Fed. Appx. at 975. Here, the TAC alleges that multiple of the instances of copyright infringement involved social media posts, which were a regular way of doing business for Jackson and Enterprises. (D.E. 85 at ¶¶ 118, 120, 124, 132, and 168.) For this reason as well, the TAC sufficiently alleges open-ended continuity.

In the alternative, the TAC alleges that Jackson's pattern of racketeering activity is a closed-ended scheme that involved related predicate acts of racketeering activity that extended over a substantial period of time, namely, over a period of at least about five years, from the infringing social media post by Defendant Jackson on September 10, 2016, to the promotion of the Forever Silhouette Logo on the website of Defendant Forever Dreamers Inc. on October 25, 2021. (D.E. 85 at ¶¶359, 364.) The TAC further alleges that during such time, there were numerous instances of criminal copyright infringement committed by Defendant Jackson involving Plaintiff's copyrights. (D.E. 85 at ¶364.) The Eleventh Circuit has found a three-year period to be a substantial amount of time for continuity purposes, and courts in this Circuit have found two years and three years to each be a substantial period of time. *See Bank of Am. Nat. Trust & Sav. Asso. v. Touche Ross & Co.*, 782 F.2d 966, 971 (11th Cir. 1986); *see also San Jacinto Savs. Ass'n v. TDC Corp. of Florida*, 707 F.Supp. 1579, 1581 (M.D. Fla. 1989); *Banco de Desarrollo Agropecuario, S.A. v. Gibbs*, 640 F. Supp. 1168, 1175 (S.D. Fla. 1986). Thus, the TAC sufficiently pleads the RICO claims as involving closed-ended continuity. Accordingly, Plaintiff has sufficiently pled, with factual particularity, the nature of the predicate RICO acts, and has sufficiently pled a pattern of racketeering activity under 18 U.S.C. § 1962(c).

## III. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' MTD.

Dated: January 26, 2022                    Respectfully submitted,

                                           By:      /s/ Jon A. Jacobson, Esq

                                           Jon A. Jacobson, Esq., FBN 155748
                                           JACOBSON LAW P.A.
                                           224 Datura St., Suite 812
                                           West Palm Beach, FL 33401
                                           Telephone: (561) 880-8900
                                           Facsimile: (561) 880-8910
                                           Email 1: jjacobson@jlpa.com
                                           Email 2: e-service@jlpa.com
                                           Email 3: jaj561@gmail.com

                                           James E. Griffith
                                           MACMILLAN, SOBANSKI & TODD, LLC
                                           720 Water Street, Fifth Floor
                                           Toledo, OH 43604
                                           Illinois Bar #: 6269854
                                           T: (419) 255-5900
                                           F: (419) 255-9639
                                           E: griffith@mstfirm.com

                                           Joseph W. Tucker
                                           MACMILLAN, SOBANSKI & TODD, LLC
                                           720 Water Street, Fifth Floor
                                           Toledo, OH 43604
                                           Ohio Bar #: 0087951
                                           T: (419) 255-5900
                                           F: (419) 255-9639
                                           E: tucker@mstfirm.com

                                           James Matthew Buchanan
                                           MACMILLAN, SOBANSKI & TODD, LLC
                                           720 Water Street, Fifth Floor
                                           Toledo, OH 43604
                                           Michigan Bar #: P61938
                                           T: (419) 255-5900

F: (419) 255-9639
E: buchanan@mstfirm.com

Timothy J. Van Tuinen
MacMillan, Sobanski & Todd, LLC
720 Water Street, Fifth Floor
Toledo, OH 43604
Ohio Bar #: 0081841
T: (419) 255-5900
F: (419) 255-9639
E: vantuinen@mstfirm.com

*Attorneys for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that a copy of the foregoing Opposition was filed electronically this day, January 26, 2022, in accordance with the Court's Electronic Filing Guidelines. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>/s/ Jon A. Jacobson, Esq</u>